## DAVIDSON *v.* CANNON ET AL.

No. 84–6470.   Argued November 6, 1985—Decided January 21, 1986

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and O'CONNOR, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *ante*, p. 336. BRENNAN, J., filed a dissenting opinion, *post*, p. 349. BLACKMUN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 349.

*James Douglas Crawford* argued the cause and filed a brief for petitioner.

*Madeleine Waters Mansier*, Deputy Attorney General of New Jersey, argued the cause for respondents. With her on

the brief were *Irwin I. Kimmelman,* Attorney General, and *James J. Ciancia,* Assistant Attorney General.

*Acting Solicitor General Fried* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Acting Assistant Attorney General Willard, Deputy Solicitor General Geller, Barbara L. Herwig,* and *Douglas N. Letter.**

JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner sued prison officials seeking damages under 42 U. S. C. § 1983 for injuries he suffered when they negligently failed to protect him from another inmate. On December 19, 1980, petitioner was threatened by one McMillian, a fellow inmate at the New Jersey State Prison at Leesburg. Petitioner sent a note reporting the incident that found its way to respondent Cannon, the Assistant Superintendent of the prison, who read the note and sent it on to respondent James, a Corrections Sergeant.† Cannon subsequently testified that he did not view the situation as urgent because on previous occasions when petitioner had a serious problem he had contacted Cannon directly.

James received the note at about 2 p.m. on December 19, and was informed of its contents. James then attended to other matters, which he described as emergencies, and left the note on his desk unread. By the time he left the prison that evening James had forgotten about the note, and since

---

*Fred E. Inbau, James P. Manak, Wayne W. Schmidt, Daniel B. Hales,* and *Courtney E. Evans* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae* urging affirmance.

†The note, addressed to a civilian hearing officer, said:

"When I went back to the unit after seeing you McMillian was on the steps outside the unit. When I was going past him he told me 'I'll fuck you up you old mother-fucking fag.' Go up to your cell, I be right there.

"I ignored this and went to another person's cell and thought about it. Then I figured I should tell you so 'if' anything develops you would be aware.

"I'm quite content to let this matter drop but evidently McMillian isn't.

"Thank you, R. Davidson." 752 F. 2d 817, 819 (CA3 1984).

neither he nor Cannon worked on December 20 or 21, the officers on duty at that time had not been informed of the threat. Petitioner took no steps other than writing the note to alert the authorities that he feared an attack, nor did he request protective custody. He testified that he did not foresee an attack, and that he wrote the note to exonerate himself in the event that McMillian started another fight. He also testified that he wanted officials to reprimand McMillian in order to forestall any future incident. On Sunday, December 21, McMillian attacked petitioner with a fork, breaking his nose and inflicting other wounds to his face, neck, head, and body.

Petitioner brought this § 1983 suit in the United States District Court for the District of New Jersey, claiming that respondents (and two others) had violated his constitutional rights under the Eighth and Fourteenth Amendments. After a bench trial, the District Court held that petitioner had not established an Eighth Amendment violation "because [respondents] did not act with deliberate or callous indifference to [petitioner's] needs and because the incident complained of was a single attack." App. 89. The court also found, however, that respondents "negligently failed to take reasonable steps to protect [petitioner], and that he was injured as a result." *Ibid.* Petitioner was thereby deprived, see *Parratt* v. *Taylor*, 451 U. S. 527, 536–537 (1981), of his liberty interest in personal security, see *Ingraham* v. *Wright*, 430 U. S. 651, 673 (1977); and because New Jersey law provides that "[n]either a public entity nor a public employee is liable for . . . any injury caused by . . . a prisoner to any other prisoner," N. J. Stat. Ann. § 59:5–2(b)(4) (1982), the court concluded that the deprivation was without due process. Petitioner was awarded compensatory damages of $2,000.

The Court of Appeals for the Third Circuit, hearing the case en banc, reversed. 752 F. 2d 817 (1984). While accepting the District Court's conclusion that respondents had been negligent, and agreeing that the attack on petitioner impli-

cated a recognized liberty interest, the majority held that respondents' negligence did not work a "deprivation" of that interest within the meaning of the Due Process Clause. The court conceded that language in *Parratt* supported the District Court's position that merely negligent conduct causing injury could constitute a Fourteenth Amendment "deprivation," but concluded that "*Parratt* does not so hold." 752 F. 2d, at 826. Accordingly, the court ruled that petitioner had failed to make out a violation of his procedural or substantive due process rights, stating that § 1983 provides no remedy "for the type of negligence found in this case." *Id.*, at 829.

Two judges who joined the majority opinion also wrote separately to suggest that even if respondents' negligence had "deprived" petitioner of liberty, the State's decision not to provide a remedy, in view of its strong interest in protecting its prison officials from liability, did not violate due process. Three judges dissented, essentially embracing the position of the District Court.

We granted certiorari, 471 U. S. 1134 (1985), and set this case for oral argument with *Daniels* v. *Williams, ante,* p. 327. Finding the principles enunciated in *Daniels* controlling here, we affirm.

In *Daniels*, we held that the Due Process Clause of the Fourteenth Amendment is not implicated by the lack of due care of an official causing unintended injury to life, liberty, or property. In other words, where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required. In this case, petitioner does not challenge the District Court's finding that respondents "'did not act with deliberate or callous indifference to [petitioner's] needs,'" 752 F. 2d, at 820. Instead, he claims only that respondents "negligently failed to protect him from another inmate." Brief for Petitioner 2. *Daniels* therefore controls.

Respondents' lack of due care in this case led to serious injury, but that lack of care simply does not approach the sort

of abusive government conduct that the Due Process Clause was designed to prevent. *Daniels, ante,* at 331–333. Far from abusing governmental power, or employing it as an instrument of oppression, respondent Cannon mistakenly believed that the situation was not particularly serious, and respondent James simply forgot about the note. The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.

In an effort to limit the potentially broad sweep of his claim, petitioner emphasizes that he "does not ask this Court to read the Constitution as an absolute guarantor of his liberty from assault by a fellow prisoner, even if that assault is caused by the negligence of his jailers." Brief for Petitioner 17. Describing his claim as one of "procedural due process, pure and simple," *id.,* at 14, all he asks is that New Jersey provide him a remedy. But the Fourteenth Amendment does not require a remedy when there has been no "deprivation" of a protected interest. Petitioner's claim, based on respondents' negligence, is quite different from one involving injuries caused by an unjustified attack by prison guards themselves, see *Johnson* v. *Glick,* 481 F. 2d 1028 (CA2), (Friendly, J.), cert. denied *sub nom. John* v. *Johnson,* 414 U. S. 1033 (1973), or by another prisoner where officials simply stood by and permitted the attack to proceed, see *Curtis* v. *Everette,* 489 F. 2d 516 (CA3 1973), cert. denied *sub nom. Smith* v. *Curtis,* 416 U. S. 995 (1974). As we held in *Daniels,* the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials.

Accordingly, the judgment of the Court of Appeals for the Third Circuit is affirmed.

*It is so ordered.*

[For opinion of JUSTICE STEVENS concurring in the judgment, see *ante,* p. 336].

JUSTICE BRENNAN, dissenting.

I agree with the Court that merely negligent conduct by a state official, even though causing personal injury, does not constitute a deprivation of liberty under the Due Process Clause. I do believe, however, that official conduct which causes personal injury due to recklessness or deliberate indifference, does deprive the victim of liberty within the meaning of the Fourteenth Amendment.

As JUSTICE BLACKMUN persuasively demonstrates in his dissent, the record in this case strongly suggests that the prison officials' failure to protect petitioner from attack was reckless and not merely negligent. Accordingly, like JUSTICE BLACKMUN, I would vacate the judgment and remand this case so that the Court of Appeals may review the District Court's holding that respondents' conduct was not reckless.

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL joins, dissenting.

When the State of New Jersey put Robert Davidson in its prison, it stripped him of all means of self-protection. It forbade his access to a weapon. N. J. Dept. of Corrections Standards 251.4.a.201 and .202. It forbade his fighting back. Standards 251.4.a.002, .003, and .004. It blocked all avenues of escape. The State forced Davidson to rely solely on its own agents for protection. When threatened with violence by a fellow inmate, Davidson turned to the prison officials for protection, but they ignored his plea for help. As a result, Davidson was assaulted by another inmate. He suffered stab wounds on his face and body as well as a broken nose that required surgery.

The Court nevertheless excuses the prison officials from liability under 42 U. S. C. § 1983, holding that because the officials were "merely negligent in causing the injury" there was no "deprivation" of liberty without due process of law.

*Ante,* at 347. It relies for this proposition and result on the easier companion case, *Daniels* v. *Williams, ante,* p. 327, which overrules in part *Parratt* v. *Taylor,* 451 U. S. 527 (1981). In *Daniels,* also a § 1983 suit, the Court holds that a pretrial detainee, allegedly injured when he slipped on a pillow negligently left on the jail stairs by a deputy, as a matter of law suffered no deprivation under the Fourteenth Amendment.

While I concur in the judgment in *Daniels,* I do not join the Court in extending that result to this case. It is one thing to hold that a commonplace slip and fall, or the loss of a $23.50 hobby kit, see *Parratt* v. *Taylor, supra,* does not rise to the dignified level of a constitutional violation. It is a somewhat different thing to say that negligence that permits antici-pated inmate violence resulting in injury, or perhaps leads to the execution of the wrong prisoner, does not implicate the Constitution's guarantee of due process. When the State in-carcerated Daniels, it left intact his own faculties for avoiding a slip and a fall. But the State prevented Davidson from defending himself, and therefore assumed some responsibil-ity to protect him from the dangers to which he was exposed. In these circumstances, I feel that Davidson was deprived of liberty by the negligence of the prison officials. Moreover, the acts of the state officials in this case may well have risen to the level of recklessness. I therefore dissent.

I

Davidson broke up a fight between two other inmates. Two days later, on Friday, December 19, 1980, the three were brought before a prison disciplinary officer. Only one of the three, Gibbs, was found guilty of fighting. When Davidson and the other inmate, McMillian, returned to their unit, McMillian threatened Davidson. Davidson decided to report the threat, in part to exonerate himself in advance but primarily to get the prison officials to take precautions. App. 85 (District Court's findings of fact). See also *id.,* at

75. Accordingly, Davidson reported the threat to Officer Garcia. Because McMillian had a history of prison assaults and fighting, *id.*, at 33–34, 62, Garcia recognized the seriousness of McMillian's threats. Garcia had Davidson relate the incident in writing. He then took Davidson's note, and told Davidson to return to his unit.

Garcia delivered the note to respondent Cannon, Assistant Superintendent of the prison, and described its contents. Cannon did not think the threat serious because Davidson had not personally come to him to report it and because of the nature of the earlier fight. *Id.*, at 44, 46. Cannon nonetheless asked to speak to Davidson, but changed his mind when he learned that Davidson had already returned to his unit. *Id.*, at 42. Rather than take one of the usual preventive measures, such as separating the two inmates, placing Davidson in protective custody, or attempting to ascertain the gravity of the threat by talking to the two, *id.*, at 44, Cannon simply told Garcia to pass the note along to respondent James, a Corrections Sergeant in the Internal Affairs Unit. *Id.*, at 43.

Garcia followed Cannon's order, giving the note to James at approximately 2:15 p.m., and informing James that it concerned a threat to Davidson by McMillian. *Id.*, at 38–39. Because James was not ordered to act immediately, he decided there was no urgency. James also decided not to follow the normal procedure of interviewing the complainant. *Id.*, at 50. James had two other tasks that he considered to be of higher priority, *id.*, at 61—paperwork and a report of a knife in a cell. James described the latter as an emergency situation; he conceded, however, that that cell had been double locked so that it was secure. *Id.*, at 51. James' regular shift ended at 4 p.m., but he worked a second shift that night as Assistant Center Keeper until 10:30 p.m. The Center Keeper ordinarily investigates threats to inmates, but again James took no action on the threat to Davidson. *Id.*, at 54–55. The second shift was "normal and routine." *Id.*, at

59. James made at least two conscious decisions not to act on the note; by the time he left the prison, he had forgotten about it. *Ibid.* Had he remembered, he would have notified the weekend shift. *Id.*, at 59–60. A reported threat would not normally be ignored over the weekend. *Id.*, at 50.

Meanwhile, the prison authorities had been alerted to the potential violence through another channel. On Wednesday, December 17, Officer Gibson wrote a "Special Report" stating that an inmate source had told him the fight involving Davidson and McMillian was "not over yet." Gibson recommended keeping Davidson and Gibbs in the detention area for their own protection. *Id.*, at 80. This recommendation was apparently ignored, as both Davidson and McMillian remained in their regular unit.

Neither Cannon nor James worked during the weekend. *Id.*, at 48. On Sunday, December 21, McMillian attacked Davidson, *id.*, at 28, inflicting the injuries that gave rise to this suit.

## II

The Court appears to recognize that the injuries to Davidson (as well as that to Daniels in the companion case, *ante*, p. 327) implicates the "liberty" protected by the Fourteenth Amendment. It is well established that this liberty includes freedom from unjustified intrusions on personal security. *Ingraham* v. *Wright*, 430 U. S. 651, 673–674 (1977). In particular, it includes a prisoner's right to safe conditions and to security from attack by other inmates. See *Youngberg* v. *Romeo*, 457 U. S. 307, 315–316 (1982).[1] Before a State can

---

[1] The Court in *Youngberg* v. *Romeo* held that an infringement of an institutionalized mental patient's liberty interest in safe conditions would not violate due process if it resulted from a professionally acceptable judgment concerning the conditions of confinement. The essence of Davidson's complaint, of course, is that the judgments made by respondents were not acceptable. *Youngberg*, in any event, is factually inapposite here, because Davidson—like Daniels—does not challenge the general conditions of his confinement.

deprive a prisoner of the liberty he retains after imprisonment, it must afford him constitutionally adequate procedures. *Vitek* v. *Jones*, 445 U. S. 480, 493–494 (1980).

Although Daniels' and Davidson's liberty interests were infringed, the Court holds that they were not "deprived" of liberty in the constitutional sense. In the past, we have held that the Fourteenth Amendment requires a "familiar *two-stage analysis:* We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property.'" *Ingraham* v. *Wright*, 430 U. S., at 672 (emphasis added). If so, "we then must decide what procedures constitute 'due process of law.'" *Ibid.* But I agree with the Court that a deprivation of liberty under the Fourteenth Amendment generally requires more than a mere infringement of a liberty interest. I also agree that the purpose of the Fourteenth Amendment's Due Process Clause should guide our determination of what actions constitute a deprivation of liberty under the Clause. A deprivation must contain some element of abuse of governmental power, for the "touchstone of due process is protection of the individual against arbitrary action of government." *Wolff* v. *McDonnell*, 418 U. S. 539, 558 (1974). Finally, I agree that mere negligent activity *ordinarily* will not amount to an abuse of state power. Where the Court today errs, in my view, is in elevating this sensible rule of thumb to the status of inflexible constitutional dogma. The Court declares that negligent activity can *never* implicate the concerns of the Due Process Clause. I see no justification for this rigid view. In some cases, by any reasonable standard, governmental negligence is an abuse of power.[2] This is one of those cases.

---

[2] It is important not to confuse negligence with the absence of deliberate action. Negligent acts are often deliberate. W. Prosser, D. Dobbs, W. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 31, p. 171 (5th. ed. 1984) (Prosser); see, *e. g., The Germanic,* 196 U. S. 589 (1905). Respondents Cannon and James did not act inadvertently. They deliber-

It seems to me that when a State assumes sole responsibility for one's physical security and then ignores his call for help, the State cannot claim that it did not know a subsequent injury was likely to occur. Under such circumstances, the State should not automatically be excused from responsibility. In the context of prisons, this means that once the State has taken away an inmate's means of protecting himself from attack by other inmates, a prison official's negligence in providing protection can amount to a deprivation of the inmate's liberty, at least absent extenuating circumstances.[3] Such conduct by state officials seems to me to be the "arbitrary action" against which the Due Process Clause protects. The

ately decided that the threat to Davidson was not serious. Whether conduct is denominated negligent or intentional can be a function of the likelihood that harm will occur. Where occurrence of the harm is substantially certain, the law imputes to the actor an intent to cause it. Restatement (Second) of Torts § 8A, Comment *b* (1965). Where harm is less certain, we may call the actor negligent. Prosser, *supra*, at 170. In some circumstances, the risk of injury is so high that the government's failure to make efforts to avoid the injury is unacceptable, even if its omission still might be categorized as negligence.

[3] *Estelle* v. *Gamble*, 429 U. S. 97, 106 (1976), is not to the contrary. In *Estelle*, the Court held that a valid Eighth Amendment claim based on a prison physician's diagnosis or treatment required an allegation of deliberate indifference rather than one of mere negligence. The requirement that deliberate indifference or wantonness be shown flows directly from the requirement of cruel and unusual conduct. The type of conduct about which the drafters of the Eighth Amendment were primarily concerned included " 'torture[s]' and other 'barbar[ous]' methods of punishment" (quotations and citation omitted). *Id.*, at 102. As is shown in the text, *infra*, the concerns underlying the Due Process Clause are broader than those underlying the Eighth Amendment.

A prison is not the only setting in which governmental negligence may amount to an abuse of power. If police officers arrest a motorist on the freeway and leave his young children alone in the car by the side of the road on a cold night, any resulting injury to the children might well constitute a "deprivation" within the meaning of the Fourteenth Amendment. Cf. *White* v. *Rochford*, 592 F. 2d 381 (CA7 1979).

officials' actions in such cases thus are not remote from the purpose of the Due Process Clause and § 1983.[4]

Moreover, this case does not raise the concern noted in *Daniels, ante,* at 332, that "[t]he only tie between the facts . . . and anything governmental in nature" is the identity of the parties. In *Daniels,* the negligence was only coincidentally connected to an inmate-guard relationship; the same incident could have occurred on any staircase. Daniels in jail was as able as he would have been anywhere else to protect himself against a pillow on the stairs. The State did not prohibit him from looking where he was going or from taking care to avoid the pillow.[5]

In contrast, where the State renders a person vulnerable and strips him of his ability to defend himself, an injury that results from a state official's negligence in performing his duty is peculiarly related to the governmental function. Negligence in such a case implicates the " '[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Monroe* v. *Pape,* 365 U. S. 167, 184 (1961), quoting *United States* v. *Classic,* 313 U. S. 299, 326 (1941). The deliberate decision not to protect Davidson from a known threat

---

[4] In adopting the predecessor of § 1983, Congress sought a remedy "against those who representing a State in some capacity were *unable* or *unwilling* to enforce a state law." *Monroe* v. *Pape,* 365 U. S. 167, 176 (1961) (emphasis in original).

[5] While negligence of prison officials can constitute a due process violation, general conditions of confinement do not ordinarily give rise to the increased standard of care discussed above. Prison conditions are typically part of the State's legitimate restraint of liberty as a function of punishing convicted persons. See *Rhodes* v. *Chapman,* 452 U. S. 337 (1981). "Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial." *Bell* v. *Wolfish,* 441 U. S. 520, 537 (1979). See also *Block* v. *Rutherford,* 468 U. S. 576 (1984).

was directly related to the often violent life of prisoners. And protecting inmates from attack is central to one of the State's primary missions in running a prison—the maintenance of internal security. See *Hudson* v. *Palmer*, 468 U. S. 517, 524 (1984).

The Fourteenth Amendment is not "trivialized," see *Daniels, ante,* at 332, by recognizing that in some situations negligence can lead to a deprivation of liberty. On the contrary, excusing the State's failure to provide reasonable protection to inmates against prison violence demeans both the Fourteenth Amendment and individual dignity.[6]

## III

Even were I to accept the Court's rigid view of what constitutes a deprivation, I would not vote to affirm the judgment of the Court of Appeals. Although the District Court ruled that the prison officials' conduct here was not reckless, there is substantial reason to doubt that conclusion. Since the Court of Appeals did not review the recklessness holding, I would remand the case for that review.

The Court has previously indicated that prison officials act recklessly when they disregard the potential for violence between a known violent inmate and a known likely victim. In *Smith* v. *Wade*, 461 U. S. 30 (1983), the Court recognized that a prison guard had acted recklessly in placing a known violent inmate in a cell shared by the previously victimized plaintiff and another inmate, without attempting to locate an empty cell nearby. The plaintiff, who had recently been removed from protective custody, was assaulted by his cellmates. It is far from clear that the officials in the present case were any less reckless.

---

[6] The Court's notion of trivialization is especially difficult to understand given its recognition that negligent behavior may violate other constitutional provisions. See *United States* v. *Leon,* 468 U. S. 897, 919–923, and n. 23 (1984) (Fourth Amendment).

Even if respondents' conduct ordinarily would be considered only negligent, the forewarning here changes the constitutional complexion of the case. When officials have actual notice of a prisoner's need for physical protection, "'administrative negligence can rise to the level of deliberate indifference to or reckless disregard for that prisoner's safety.'" *Layne* v. *Vinzant*, 657 F. 2d 468, 471 (CA1 1981), quoting *West* v. *Rowe*, 448 F. Supp. 58, 60 (ND Ill. 1978). See also *Matzker* v. *Herr*, 748 F. 2d 1142, 1149 (CA7 1984); *Miller* v. *Solem*, 728 F. 2d 1020, 1024–1025 (CA8), cert. denied, 469 U. S. 841 (1984). Cf. *Baker* v. *McCollan*, 443 U. S. 137, 148 (1979) (concurring opinion) (sheriff who failed to adopt procedures for identifying arrestees was negligent rather than reckless when he had not previously been notified of the legitimate need for or duty to adopt such procedures).

Respondents "had the responsibility to care for plaintiff's safety, actual notice of the threat by an inmate with a known history of violence, and an opportunity to prevent harm to plaintiff." App. 89 (District Court's conclusions of law). Both respondents knew that McMillian had threatened Davidson after the fight and that Davidson had reported the threat immediately. Although Cannon knew that McMillian was a troublemaker, *id.*, at 41, he nonetheless chose to think that the situation was not serious. *Id.*, at 42. Likewise, James decided to attend to other matters during the entire eight hours he worked after receiving the note. *Id.*, at 86–87. Cannon and James intentionally delayed protecting Davidson's personal security in the face of a real and known possibility of violence. See *Porm* v. *White*, 762 F. 2d 635, 636–638 (CA8 1985). Cf. *Estelle* v. *Gamble*, 429 U. S. 97, 104–105 (1976) (intentional delay in providing necessary medical care to seriously ill inmate can constitute deliberate indifference and thus violate the Eighth Amendment). Cannon did not check on what James had found; James turned his back on the violence brewing for the weekend. Yet the risk

that harm would occur was substantial and obvious. Respondents' behavior very well may have been sufficiently irresponsible to constitute reckless disregard of Davidson's safety.

Even if negligence is deemed categorically insufficient to cause a deprivation under the Fourteenth Amendment, recklessness must be sufficient. Recklessness or deliberate indifference is all that a prisoner need prove to show that denial of essential medical care violated the Eighth Amendment's ban on cruel and unusual punishments. See *Estelle* v. *Gamble*, 429 U. S., at 104. The Due Process Clause provides broader protection than does the Eighth Amendment, see, *e. g.*, *Bell* v. *Wolfish*, 441 U. S. 520 (1979); *Ingraham* v. *Wright*, 430 U. S. 651 (1977); *Wolff* v. *McDonnell*, 418 U. S., at 557–558; *Revere* v. *Massachusetts General Hospital*, 463 U. S. 239, 244 (1983), so a violation of the Due Process Clause certainly should not require a more culpable mental state.

## IV

The deprivation of Davidson's liberty interest violated the Fourteenth Amendment if it occurred "without due process of law." That condition is clearly satisfied. In both *Parratt* and *Hudson*, the Court held that where a deprivation of property was caused by a random and unauthorized act of a state official, it was impracticable for the State to provide process in advance and the State could satisfy procedural due process by a meaningful postdeprivation remedy, such as a tort suit. *Parratt* v. *Taylor*, 451 U. S., at 541; *Hudson* v. *Palmer*, 468 U. S., at 520–521. Even assuming the same is true for deprivations of liberty, New Jersey has failed to provide a meaningful postdeprivation remedy. By statute, the State has ruled: "Neither a public entity nor a public employee is liable for . . . any injury caused by . . . a prisoner to any other prisoner." N. J. Stat. Ann. § 59:5–2(b)(4) (West 1982). The State acknowledges that it would have asserted the immunity statute as a defense to a state-court action and

that Davidson's complaint would have been dismissed before being heard on the merits. Brief for Respondents 34.

Conduct that is wrongful under § 1983 surely cannot be immunized by state law. A State can define defenses, including immunities, to state-law causes of action, as long as the state rule does not conflict with federal law. *Ferri* v. *Ackerman*, 444 U. S. 193, 198 (1979). But permitting a state immunity defense to control in a § 1983 action "'would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced.'" *Martinez* v. *California*, 444 U. S. 277, 284, n. 8 (1980), quoting *Hampton* v. *Chicago*, 484 F. 2d 602, 607 (CA7 1973), cert. denied, 415 U. S. 917 (1974). It is irrelevant that state immunity as applied to defeat a state-law tort claim is constitutional, and may be construed as one aspect of the State's definition of a tort claim. See 444 U. S., at 281–282, and n. 5. Since § 1983 was designed to attack the misuse of state power, "government officials, as a class, could not be totally exempt, by virtue of some absolute immunity, from liability under its terms." *Scheuer* v. *Rhodes*, 416 U. S. 232, 243 (1974).

Strong federal interests argue for allowing Davidson to bring his suit in the face of the New Jersey statute. See *Ferri* v. *Ackerman*, 444 U. S., at 198, n. 13. First, "a deprivation of a constitutional right is significantly different from and more serious than a violation of a state right and therefore deserves a different remedy even though the same act may constitute both a state tort and the deprivation of a constitutional right." *Monroe* v. *Pape*, 365 U. S., at 196 (concurring opinion). Second, the legislative history of § 1983's predecessor makes clear that Congress intended to alter the federal-state relationship with respect to the protection of federal rights. "The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights." *Mitchum* v. *Foster*, 407 U. S. 225, 242 (1972). In particular, Congress in-

tended "to provide a federal remedy where the state remedy . . . was not available in practice." *Monroe* v. *Pape*, 365 U. S., at 174.

Davidson has been denied "'an *opportunity* . . . granted at a meaningful time and in a meaningful manner' . . . 'for [a] hearing appropriate to the nature of the case.'" *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 437 (1982) (citations omitted) (emphasis in original). Lacking a meaningful post-deprivation remedy in state court, Davidson was deprived of his liberty without due process of law.

I therefore would reverse the judgment of the Court of Appeals and order that the District Court award of $2,000 be reinstated. If I agreed with the rigid rule announced in *Daniels*—which I do not—I would vacate the judgment and remand the case for review of the District Court's finding that the respondents' conduct was not reckless.